UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In re INTUNIV ANTITRUST
LITIGATION

This Document Relates to:

*All Indirect Purchaser Class Actions*

Lead Case No.: 1:16-cv-12396

**MEMORANDUM IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. CLASSWIDE EVIDENCE WILL PROVE PLAINTIFFS' CASE .......................... 2

   A. Shire's Intuniv Patents Were Likely to be Found Invalid .............................. 2

   B. Shire and Actavis Delayed Generic Competition and Divided the Market .................. 4

      1. Shire Positioned TWi/Anchen as an Authorized Generic Threat ...................... 5

      2. Actavis Was Poised to Launch At Risk in the Fall of 2012 .............................. 5

      3. Post-Trial Settlement Negotiations Confirm Anticompetitive Intent ................ 6

      4. The Settlement is a Barely Disguised No-AG Agreement ................................ 7

III. ARGUMENT ................................................................................................... 10

   A. Class Certification Is Appropriate Under Rule 23(a) .................................... 11

      1. Joinder Is Impracticable .................................................................... 11

      2. Plaintiffs' Claims Present Common Issues of Law and Fact ........................... 12

      3. Plaintiffs' Claims are Typical of Those of the Classes .................................. 12

      4. Plaintiffs and Counsel Will Adequately Represent the Class .......................... 13

      5. The Class is Ascertainable ................................................................. 14

   B. Class Certification is Appropriate Under Rule 23(b)(3) ............................... 15

      1. Common Antitrust Issues Predominate ............................................... 15

         a. Law on Predominance .................................................................. 15

         b. Questions Regarding Defendants' Violations of the Sherman Act and State Antitrust and Consumer Protection Laws Predominate ................................. 16

            (i) Unlawful Restraint of Trade ....................................................... 17

            (ii) Monopolization and Attempted Monopolization .......................... 17

         c. Common Issues as to Market Power Predominate .................................... 17

         d. Common Proof of Antitrust Impact Predominates ................................... 18

         e. Common Issues Predominate at to Aggregate Damages ........................... 18

2. A Class Action is Superior to Other Available Methods of Adjudication........ 19

IV. CONCLUSION..................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Advert. Specialty Nat. Ass'n v. FTC,*
    238 F.2d 108 (1st Cir. 1956) ........................................................................................ 12

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ......................................................................................... 12, 16, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) .................................................................................................... 11

*Andrews v. Bechtel Power Corp.,*
    780 F.2d 124 (1st Cir. 1985) ...................................................................................... 14

*Barba et al. v. Shire U.S., Inc., et al.,*
    Case No. 1:13-21158, ECF. No. 374 (S.D. Fla. Dec.15, 2015) ................................. 15

*Bezdek v. Vibram USA Inc.,*
    79 F. Supp. 3d 324, 339 (D. Mass. 2015) ................................................................. 10

*Comcast Crop. v. Behrend,*
    133 S. Ct. 1426 (2013) ............................................................................................... 19

*Díaz Aviation Corp. v. Airport Aviation Servs., Inc.,*
    716 F.3d 256 (1st Cir. 2013) ...................................................................................... 18

*Eisen v. Carlisle and Jacqueline,*
    417 U.S. 156 (1974) .................................................................................................... 21

*FTC v. Actavis,*
    133 S. Ct. 2223 (2013) ............................................................................................... 12

*Garcia-Rubiera v. Calderon,*
    570 F.3d 443 (1st Cir. 2009) ...................................................................................... 12

*In re Asacol Antitrust Litig.,*
    -- F.3d. --, 2018 WL 4495856 (1st Cir. Oct. 15, 2018) .............................................. 11

*In re Carbon Black Antitrust Litig.,*
    No. 03-10191, 2005 WL 102966 ............................................................................... 21

*In re Cardizem Antitrust Litig.,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000) .................................................................... 19

*In re Evergreen Ultra Short Opportunities Fund Securities Litig.*,
    275 F.R.D. 382 (D. Mass. 2011) ..................................................................... 13

*In re Flonase Antitrust Litig.*,
    284 F.R.D. 207 (E.D. Pa. 2012) ................................................................. 11, 15

*In re Lidoderm Antitrust Litig.*,
    14-md-02521, 2017 WL 679367 (N.D. Cal. Dec. 21, 2017) ...................... 11, 15

*In re NASDAQ Mkt. Makers*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................... 15, 19

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    522 F.3d 6, 18 (1st Cir. 2008) ........................................................................ 11

*In re Nexium Antitrust Litig.* (*Nexium I*),
    777 F.3d 9, 27 (1st Cir. 2015) ..................................................... 11, 15, 19, 20

*In re Nexium Antitrust Litig.* (*Nexium II*),
    296 F.R.D. 47 (D. Mass 2013) .................................................................. 12, 13

*In re Nexium Antitrust Litig., (Nexium III)*,
    297 F.R.D. 168 (D. Mass. 2013) ............................................................... 12, 17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    252 F.R.D. 83 (D. Mass. 2008) ................................................... 12, 17, 19, 20

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004) ............................................... 11, 15, 20

*In re Volkswagen and Audi Warranty Extension Litig.*,
    273 F.R.D. 349 (D. Mass. 2011) ..................................................................... 16

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ........................................................................... 17

*Lee v. Life Ins. Co. of N. Am.*,
    829 F. Supp. 529 (D.R.I. 1993) ..................................................................... 17

*Matamoros v. Starbucks Corp.*,
    699 F.3d 129 (1st Cir. 2012) ..................................................................... 14, 15

*Morris v. Nestlé Waters N. Am., Inc.*,
    321 F. Supp. 3d 230 (D. Mass. 2018) ............................................................ 10

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*
   247 F.R.D. 253 (D. Mass. 2008) .................................................................. 13

*Payne v. Goodyear Tire & Rubber Co.,*
   216 F.R.D. 21 (D. Mass. 2003) .................................................................... 11

*Romulus v. CVS Pharmacy, Inc.,*
   321 F.R.D. 464 (D. Mass. 2017) .................................................................. 15

*Sanofi-Aventis v. Apotex Inc.,*
   659 F.3d 1171 (Fed. Cir. 2011) ............................................................. 1, 5, 6

*Shire, LLC v. Actavis Elizabeth, LLC,*
   No. 10-cv-397 (D. Del., filed May 12, 2010) ............................................... 3

*Shire, LLC v. Anchen Pharm., Inc.,*
   No. 10-cv-484 (D. Del. June 2, 2010) .......................................................... 3

*Shire, LLC v. Impax Labs., Inc.,*
   No. 10-cv-5467 (N.D. Cal., filed Dec. 10, 2010) ......................................... 4

*Shire, LLC v. Mylan Pharm., Inc.,*
   No 11-cv-55 (N.D.W.Va., filed Apr. 20, 2011) ............................................ 4

*Shire, LLC v. Sandoz, Inc.*
   No. 11-cv-01110 (D. Colo., filed Apr. 27, 2011) ......................................... 4

*Shire, LLC v. Teva Pharm. USA, Inc.,*
   No. 10-cv-329 (D. Del., filed Apr. 10, 2010) .......................................... 3, 4

*Smilow v. Sw. Bell Mobile Sys., Inc.,*
   323 F.3d 32 (1st Cir. 2003) ........................................................................ 16

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011) ......................................................................... 12, 13

*Waste Mgmt. v. Mowbray,*
   208 F.3d 288 (1st Cir. 2000) ............................................................ 12, 16, 17

*Zenith Radio Corp. v. Hazeltine Research,*
   395 U.S. 100 (1969) ................................................................................... 18

## Other Authorities

Herbert B., Newberg & Alba Conte, Newberg on Class Actions § 10.05 at 10-8 (3d ed. 1992) . 20

## I. INTRODUCTION

This case concerns an illegal scheme to delay generic competition with the pharmaceutical drug known as Intuniv® ("Intuniv"). In April 2013, Defendants Shire U.S., Inc. and Shire, LLC (collectively, "Shire")—the branded manufacturer and patent-holder for Intuniv—and Defendants Actavis Elizabeth LLC and Actavis Holdco U.S., Inc. (collectively, "Actavis")—a manufacturer seeking to market a generic version of the drug—entered into an illegal "reverse payment" settlement to end patent litigation Shire had brought against Actavis. Actavis agreed to delay launching its generic Intuniv until December 2014. In exchange, Shire agreed not to launch any competing authorized generic ("AG")[1] Intuniv. This enabled Shire to unfairly extend its branded drug monopoly, and ensured that Actavis would not face any AG competition (and, further, no other generic competition until June 2015). As a result, purchasers paid more for branded and generic Intuniv than they would have absent Defendants' exclusionary conduct.

The named plaintiffs and class representatives in this case—Tina Picone, Sherry Cummisford, Shana Wright, and Carmen Richard (collectively, the "Indirect Purchaser Plaintiffs" or "IPPs")—are a group of consumers who purchased Intuniv and/or its generic equivalents for household use. Defendants' conduct caused IPPs and other consumers like them to pay inflated, supra-competitive prices (including co-pays and co-insurance) for Intuniv and its generic equivalents for longer than they otherwise would have. IPPs seek to represent a Nationwide Consumer class or, alternatively, a class of consumers in 25 states and the District of Columbia, i.e. jurisdictions that have so-called "*Illinois Brick* repealer" laws in place. As discussed *infra*, IPPs' claims are by their very nature subject to common proof. Common

---

[1] An AG "is a generic drug sold by the company who markets the brand name drug (or a third party licensee)." *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1174–1175 (Fed. Cir. 2011) (citations omitted).

evidence will predominantly prove the illegality and impact of Defendants' conduct. The expert report of Dr. Meredith Rosenthal further explains that identification of class members and quantification of their aggregate damages is possible using common, objective criteria.[2] As such, this matter should proceed as a class action, with Kanner & Whiteley and Golomb & Honik serving as class counsel.

## II. CLASSWIDE EVIDENCE WILL PROVE PLAINTIFFS' CASE

The evidence discussed below illustrates the types of common evidence that will be used at trial to obtain relief for all class members.

### A. Shire's Intuniv Patents Were Likely to be Found Invalid

Intuniv, Shire's brand name for extended-release guanfacine hydrochloride, is a non-stimulant medication approved for the treatment of Attention Deficit Hyperactivity Disorder ("ADHD") in pediatric and adolescent patients.[3] ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████     ████

---

[2] *See* Rpt. of Dr. Meredith Rosenthal ("Rosenthal Rpt.") (Nov. 1, 2018), attached hereto, ████████████████.

[4] ████████████████████████████████████████

[5] ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Shire began selling Intuniv ███████████████████████████████████████ ███████████████████████████████████████████ in September 2009.[7] ███████ ████████████████████████████████████████████████████████████, generic manufacturers were able to file abbreviated new drug applications ("ANDAs") with the FDA ██ ███████████.[8] Actavis was the first to file a substantially complete ANDA ████████████ ███.[9] As required under the Hatch-Waxman Act,[10] Actavis served Shire with a "Paragraph IV" certification ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████.[11]

Crucially, Actavis's status as the "first to file" entitled it to a lucrative 180-day period of marketing exclusivity under the Hatch Waxman Act.[12] Multiple generic manufacturers filed ANDAs after Actavis, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████.

In response, Shire fired off a series of patent infringement lawsuits against each and every generic challenger.[14] Shire understood that, under the Hatch-Waxman Act, such litigation

---

[7] ███████████

[8] █████

[9] ███████████████████████████████████

[10] Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355(j) (commonly referred to as the "Hatch-Waxman Act").

[11] ██████████████████████████████████████████ Under Hatch-Waxman, if an ANDA applicant seeks to market a generic drug prior to expiration of a patent listed in the Orange Book, it must submit a certification to both the FDA and the patentee asserting that any patents are "invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). This is commonly referred to as a "Paragraph IV certification."

[12] *See* 21 U.S.C. § 355(j)(5)(B)(iv).

[13] █

[14] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

would prevent the FDA from approving any ANDA for up to 30 months.[15] Shire's suits against

potential generic competitors ███████████████████████ were consolidated in the District

of Delaware (hereafter, the "Consolidated Case").[17]



## B. Shire and Actavis Delayed Generic Competition and Divided the Market

Thereafter, Shire settled the patent lawsuits in a coordinated and interlocking manner that

maximized the delay of generic entry, as well as its own supra-competitive profits. Actavis

became a willing partner in this scheme.

---

[15] *See* 21 U.S.C. § 355(j)(5)(B)(iii).





Shire put the anticompetitive scheme in motion by settling with TWi/Anchen just before the trial was set to begin in the Consolidated Case.[24]

On October 5, 2012, the FDA issued final approval to Actavis.[28] From a regulatory view, Actavis was free to launch



*Id.*

"at risk" as of that date. ████████████████████████████████

████████ ██████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████ ████████████████████████████

█████████████████████████████████████████████████████

██████ ███████████████████████████████████████████████

█████████████████████████████████████████████████████

██████ ██

██████████████████████████████████████████

After the Consolidated Case trial, Shire broached the possibility of settlement ████

████████████████████████████.[33] █████████████████████████████

█████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

█████████████████████████████████████████████████████



[29]



*First*, the final terms of the settlement all but ensured that Shire would not launch an AG during Actavis's exclusivity period, ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

*Second*, Defendants' post-settlement conduct further confirms ██████████████ that Actavis was going to █████████████████████ ████████ sell its generic without fear of AG competition. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ███████████████████████████

████████████████████████████ In ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████

---



41 ███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████ █ ██████
█████████████████████████████████████████ .

*See* https://www.prnewswire.com/news-releases/shire-settles-all-pending-litigation-with-actavis-and-watson-concerning-intuniv-204674861.html; ████████████████████████ |
Ex. 42, ███████████████████████████ .
45 ████████████████████████████████████████████████████████████████████
████████████████████████████████████ ██████████████████████ █████████
██████ ███████████████████████████████████████ ████████ ████████████



After the settlement, Actavis was likewise unconcerned regarding the prospect of AG competition.

The foregoing is only a sample of the common evidence Plaintiffs have to support certification in this case.  This, and other common proof, will conclusively demonstrate that Shire and Actavis conspired to unfairly delay generic competition, which resulted in higher



prices to all class members.  Consumers like IPPs were damaged in a uniform manner as a result of this conduct. As such, for the reasons discussed below, certification of this matter as a class action is appropriate.

### III. ARGUMENT

Plaintiffs seek certification of a "Nationwide Class" applying Massachusetts law,[52] or, alternatively a class of the 26 jurisdictions with "*Illinois Brick* repealer laws"[53] as defined in Plaintiff's cover motion. To meet the threshold requirements of class certification under Rule 23(a), IPPs must establish that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[54]

While Plaintiffs bear the burden of showing the prerequisites for class certification are met, they "need not make that showing to a degree of absolute certainty."[55] Courts consider

---

[52] A nationwide class is appropriate here under Massachusetts General Law ch. 93A.  Out-of-state plaintiffs (such as non-Massachusetts class members) may sue under chapter 93A.  *See, e.g.*, *Morris v. Nestlé Waters N. Am., Inc.*, 321 F. Supp. 3d 230, 241 (D. Mass. 2018); *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 339 (D. Mass. 2015). Even if this were not the case, Defendants have robust contacts with Massachusetts justifying extra-territorial application of Massachusetts law. Shire, for instance, has its headquarters located in Massachusetts, *see* (https://www.shire.com/contact-us), has long-had ███████████████ in Massachusetts, *see* Ex. 51, ████████████████ and purposefully avails itself of doing business in the Commonwealth by selling Intuniv intended for Massachusetts consumers. *See, e.g.*, Ex. 52, ████████████████████████████████████████ Ex. 53, ██████████████████████████████████). Similarly, Actavis has personnel in Massachusetts, *see In Re Intuniv Antitrust Litig.*, 1:16-cv-12396, ECF No. 72-2 (D. Mass. June 30, 2017), and also purposefully avails itself of doing business in the Commonwealth by selling Intuniv intended for Massachusetts consumers. *See, e.g.*, Ex. 54, ██████████████████████████████

[53] As the First Circuit observed just two weeks ago, each of the 26 jurisdictions listed in IPPs' proposed class have "*Illinois Brick* repealer laws" that allow indirect purchasers to recover antitrust damages.  *See In re Asacol Antitrust Litig.*, -- F.3d. --, 2018 WL 4495856, at *2 (1st Cir. Oct. 15, 2018). "Importantly . . . [because] success on the claim under one state's law will more or less dictate success under another state's law," IPPs may represent the alternate *Illinois Brick* Repealer class even though the named IPPs did not purchase Intuniv in every one of the 26 jurisdictions.  *Id.* at *4.

[54] Fed. R. Civ. P. 23(a); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008).

[55] *In re Nexium Antitrust Litig.* (*Nexium I*), 777 F.3d 9, 27 (1st Cir. 2015) (quotations and citations omitted).

merits issues "only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[56]   At the class certification stage, "[d]oubts should be resolved in favor of certification."[57] Courts routinely certify indirect purchaser actions because they readily meet the Rule 23(a) criteria.[58]

This restraint of trade case is no exception.  IPPs' complaint is that instead of competition in a free market producing lower prices, Defendants agreed not to compete, and, as a result, consumers were forced to pay more than they would have had to pay but for the anti-competitive agreement. The Courts have long recognized the propriety of class actions targeting anti-competitive behavior, because the focus is on Defendants' conduct.[59] Here, aggregate damages can be computed on a class wide basis using a formula that does not require the testimony of absent class members.

## A. Class Certification Is Appropriate Under Rule 23(a)

### 1. Joinder Is Impracticable

Rule 23(a)(1) requires members of a class to be "so numerous that joinder of all members is impracticable."[60] "[I]mpracticability" simply means "the difficulty or inconvenience of joining all members of the class."[61] While Rule 23(a)(1) does not establish a precise numerical threshold, it is generally satisfied when "the potential number of plaintiffs exceeds 40."[62] Here, since at least 2013, millions of brand and generic Intuniv prescriptions have been dispensed to

---

[56]*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).
[57] *Payne v. Goodyear Tire & Rubber Co.,* 216 F.R.D. 21, 25 (D. Mass. 2003).
[58] *See, e.g., Nexium I,* 777 F.3d at 19; *In re Lidoderm Antitrust Litig.,* 14-md-02521, 2017 WL 679367 (N.D. Cal. Dec. 21, 2017); *In re Flonase Antitrust Litig.,* 284 F.R.D. 207 (E.D. Pa. 2012); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004).
[59] *See e.g., Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997); *FTC v. Actavis, Inc.,* 133 S. Ct. 2223, 2226 (2013); *In re Nexium Antitrust Litig., (Nexium III),* 297 F.R.D. 168, 172-73 (D. Mass. 2013); *Waste Mgmt. v. Mowbray,* 208 F.3d 288, 295-96 (1st Cir. 2000); *In re Pharm. Indus. Average Wholesale Price Litig.,* 252 F.R.D. 83, 93 (D. Mass. 2008).
[60] *See, In re Nexium Antitrust Litig.* (*Nexium II*), 296 F.R.D. 47 (D. Mass 2013).
[61] *Advert. Specialty Nat. Ass'n v. FTC,* 238 F.2d 108, 119 (1st Cir. 1956).
[62] *Garcia-Rubiera v. Calderon,* 570 F.3d 443, 460 (1st Cir. 2009).

individuals nationwide.[63] The sheer volume of prescriptions filled by persons during the class period makes it impracticable to join every putative class member.

### 2. Plaintiffs' Claims Present Common Issues of Law and Fact

Rule 23(a)(2) requires "questions of law or fact common to the class." A common question is one that "is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[64] For purposes of Rule 23(a)(2), even a single common question of law *or* fact will do.[65]

Here, common issues of law and fact include whether Defendants had market and/or monopoly power, whether they maintained such power through anticompetitive or unlawful activity, the class damages resulting from Defendants' anticompetitive actions (which similarly injured each of them through overcharges for brand and/or generic Intuniv) and the pace of generic erosion (and resulting price decreases) that would have occurred were it not for Defendants' illegal conduct.[66] Each of these common questions will lead to answers common to the class, advancing the litigation for all class members "in one stroke."[67]

### 3. Plaintiffs' Claims are Typical of Those of the Classes

Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." Typicality is established "when the plaintiffs' claims arise from the same course of conduct and are based on the same legal theory as the class claims."[68] It is not necessary that all class members "share identical claims."[69] Once a plaintiff shows that

---

[63] Rosenthal Rpt. ███████████

[64] *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011).

[65] *Id.*

[66] *See also*, Consol. and Am. Class Action Compl., ECF No. 39 (Mar. 10, 2017), pp. 34–35, ¶ 145 (listing common issues of law and fact).

[67] *Wal-Mart,* 131 S. Ct. at 2551.  Indeed, "the existence of an alleged conspiracy or monopoly is a common issue." *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* 247 F.R.D. 253, 264 (D. Mass. 2008) (internal citation omitted).

[68] *See e.g., In re Evergreen Ultra Short Opportunities Fund Secs. Litig.,* 275 F.R.D. 382, 389 (D. Mass. 2011).

[69] *Natchitoches,* 247 F.R.D. at 264.

claims are based on a common legal theory, typicality is satisfied "even where there is some factual variation among the claims of different class members."[70] "[A] common wrong, a core pattern of alleged anticompetitive conduct that would have similarly injured each [class member] . . . by artificially inflating the price," satisfies commonality.[71]

Plaintiffs and class members all have claims based on a common antitrust legal theory, including: unreasonable restraint of trade, unlawful and/or attempted monopolization, and unlawful conspiracy to monopolize in violation of federal antitrust statutes, which concurrently violate and harmonize with state antitrust and consumer protection laws.[72] All class members, like Plaintiffs Richard, Picone, Cummisford and Wright, suffered overcharge damages on account of Defendants' anticompetitive conduct.[73] Each paid supra-competitive prices, including co-insurance and/or co-pays, for branded or generic Intuniv.  IPPs therefore satisfy the typicality requirement.

### 4. Plaintiffs and Counsel Will Adequately Represent the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." To pass muster under the adequacy inquiry, plaintiffs must demonstrate that: (1) "the interests of the representative party will not conflict with the interests of any of the class members" and (2) chosen counsel is "qualified, experienced, and able to vigorously conduct the proposed litigation."[74] Only fundamental and substantial conflicts "that go to the heart of the litigation" will preclude a plaintiff from satisfying the adequacy requirement.[75]

---

[70] *In re Evergreen,* 275 F.R.D. at 390.
[71] *Natchitoches,* 247 F.R.D. at 264.
[72] *See Nexium II,* 297 F.R.D. at 175-76 (identifying typical elements of state and federal antitrust claims).
[73] Rosenthal Rpt. █████████
[74] *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir. 1985).
[75] *Matamoros v. Starbucks Corp.,* 699 F.3d 129, 138 (1st Cir. 2012).

Both prongs of the adequacy requirement are met here. Plaintiffs and class members have identical interests and incentives in proving the unlawfulness of Defendants' common course of anticompetitive conduct, in establishing liability, and in obtaining redress. Plaintiffs are part of the class and their economic injuries and interests are aligned with class members. Plaintiffs have every incentive to pursue full recovery, and have demonstrated their commitment to pursue their claims on behalf of absent class members.

Plaintiffs' attorneys have substantial experience in prosecuting complex litigation cases, including antitrust class actions on behalf of indirect purchasers and thus pass inspection under the second prong of Rule 23(a)(4).[76] IPPs' attorneys have demonstrated a willingness and ability to dedicate the resources and expertise necessary to fairly and adequately represent a class of plaintiffs and successfully manage a class action to its conclusion.[77]

### 5. The Class is Ascertainable

Although not technically a Rule 23 prerequisite, courts sometimes assess ascertainability as an implied Rule 23 requirement; i.e. that the proposed class be "ascertainable with reference to objective criteria."[78] Conversely stated, "[t]he presence of . . . an objective criterion overcomes the claim that the class is unascertainable."[79] A class definition merely needs to be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a [class] member."[80]

Courts have repeatedly upheld analogous class definitions in generic suppression antitrust actions as ascertainable when "defined in terms of purchasers of [the drug] during the class

---

[76] *See* "Declaration of Conlee S. Whiteley in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification," attached hereto.

[77] *Id.*

[78] *Nexium I,* 777 F.3d at 19 (citing and quoting Rubenstein, Newberg on Class Actions §§ 3:1, 3:3 (5th ed. 2013)).

[79] *Matamoros,* 699 F.3d at 139; *see also, e.g., Romulus v. CVS Pharmacy, Inc.,* 321 F.R.D. 464, 467-68 (D. Mass. 2017).

**[80]** 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1760, at 120-121 (2d ed. 1986).

period (with some exceptions that also satisfy objective standards)."[81] Here, the class is "sufficiently definite" to enable the court to determine who fits within the class definition: individual consumers who made payments for brand and/or generic Intuniv prescriptions during a particular and discrete date range. This criterion is objective. It also is administratively feasible because potential membership in the class can be verified through objective records, such as class members' own pharmacy records.[82] Further, the class definition excludes consumers who did not pay overcharges, and were thus not injured, based on additional objective criteria. For example, excluded from all proposed classes are "'flat co-pay' or 'Cadillac Plan' customers who made purchases only via fixed dollar co-payments that do not vary between a branded pharmaceutical and a generic equivalent." Accordingly, the proposed class definitions are sufficiently precise and objective.

## B. Class Certification is Appropriate Under Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to the class members predominate over any questions affecting only individual members" and that "a class action is superior to any other available methods for fairly and efficiently adjudicating the controversy."

### 1. Common Antitrust Issues Predominate

#### a. Law on Predominance

Predominance focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[83] However, predominance does not require the complete absence of individual issues or "that all issues be common to the class."[84] "A 'single central

---

[81] *Nexium I,* 777 F.3d at 19; *see also e.g., In re Lidoderm Antitrust Litig.,* Case No. 14-md-02521, 2017 WL 679367, at *25 (N. D. Cal. Feb. 21, 2017); *In re Flonase Antitrust Litig.,* 284 F.R.D. 207 (E.D. Pa. 2012); *In re Relafen,* 221 F.R.D. at 288; *see also Barba et al. v. Shire U.S., Inc., et al.,* Case No. 1:13-21158, ECF. No. 374, pp. 37–49 (S.D. Fla. Dec. 15, 2015)
[82] *See In re NASDAQ Mkt. Makers,* 169 F.R.D. 493, 517 (S.D.N.Y. 1996) (finding use of "computerized records of [a] particular industry [when] supplemented by claims forms," appropriate in plaintiff's aggregated damages model).
[83] *Amchem* 521 U.S. 591 at 623.
[84] *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 39-40 (1st Cir. 2003) (citations omitted).

issue' as to defendant's conduct *vis a vis* class members can satisfy the predominance requirement even when other elements of the claim require individualized proof."[85] Correspondingly, where a common question as to defendants' liability predominates, individual issues regarding affirmative defenses or damages will not preclude class certification.[86] "[U]nless it is clear that individual issues will overwhelm the common questions and render the class action valueless," predominance is fulfilled.[87]

Predominance is a test easily met in consumer fraud and antitrust actions.[88] For cases involving reverse payment settlements, the central, predominant common issue is whether the brand manufacturer engaged in anticompetitive conduct by paying potential generic competitors to delay market entry.[89] As discussed *supra*, Plaintiffs intend to demonstrate, with common evidence, that Defendants engaged in anticompetitive conduct in delaying the entry of generic versions of Intuniv. This question predominates over all others.

> *b. Questions Regarding Defendants' Violations of the Sherman Act and State Antitrust and Consumer Protection Laws Predominate*

Courts in this Circuit recognize that "substantial similarities" exist between federal and state antitrust laws, and further acknowledge that "violation[s] of traditional antitrust elements constitute[] a violation of the relevant consumer protection statute[s]."[90] Plaintiffs' state law

---

[85] *Payne*, 216 F.R.D. at 27.

[86] *Mowbray*, 208 F.3d at 295-96.

[87] *In re Volkswagen and Audi Warranty Extension Litig.*, 273 F.R.D. 349, 353 (D. Mass. 2011) (internal quotations and citation omitted).

[88] *See Amchem* 521 U.S. at 625; *see also, e.g.*, *Nexium III*, 297 F.R.D. at 172-73 (certifying class of end-payor plaintiffs in antitrust action arising out of delay in generic marketing); *In re AWP Litig.*, 252 F.R.D. at 93 (finding predominance met when plaintiffs brought antitrust action with various state law claims based on a uniform principle of law.); *Mowbray*, 208 F.3d at 295-96 (finding the single common question as to antitrust liability predominated individual defenses or damages); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (conduct violating state and federal antitrust laws "naturally raise[s] several questions of law and fact common to the entire class and which predominate over any issues related to individual class members"); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (noting predominance is "readily met" in certain antitrust cases "because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case").

[89] *See Actavis*, 133 S. Ct. at 2336.

[90] *See Nexium III*, 297 F.R.D. at 175-76.

claims here will rise or fall on the same predominant antitrust liability and damages issues as those in federal antitrust actions.

*(i) Unlawful Restraint of Trade*

Plaintiffs' claims of unfair, unlawful, or deceptive trade practices dovetail with the elements of federal unlawful restraint of trade claims, which turn on: "(1) the existence of a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade under the per se or rule of reason analysis; and (3) that the restraint affected interstate commerce."[91] These elements focus almost exclusively on Defendants' conduct, including the impact of and motive behind Defendants' conduct. The common evidence to establish these elements does not differentiate between individual consumer IPPs or class members.

*(ii) Monopolization and Attempted Monopolization*

Plaintiffs' claims here also focus on the anticompetitive intent and effect of Defendants' anticompetitive behavior. Using evidence common to the entire class, Plaintiffs will establish "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[92]  These elements do not vary in any way as to individual IPP consumers.

*c. Common Issues as to Market Power Predominate*

Plaintiffs will establish, through common evidence, that Defendants possessed market power for purposes of their restraint of trade and monopolization claims.  Plaintiffs can either establish market power directly (by showing supra-competitive prices) or circumstantially (by showing Intuniv had a dominant share in a relevant market).  Both types of proof will involve an analysis of common evidence, including market data and aggregate economic patterns.

---

[91] *Lee v. Life Ins. Co. of N. Am.*, 829 F. Supp. 529, 535 (D.R.I. 1993), *aff'd*, 23 F.3d 14 (1st Cir. 1994).
[92] *Díaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013) (citations omitted).

### d. Common Proof of Antitrust Impact Predominates

A plaintiff must establish some damage or injury as a result of defendants' antitrust violations to prove antitrust impact.[93] Plaintiffs will present ample common evidence, premised on market data and expert testimony, to support this element at trial. Evidence of common class impact includes proof that: (1) prices for brand Intuniv were higher than they would have been absent Defendants' conduct; (2) prices for generic Intuniv were higher than they would have been absent Defendants' conduct; and (3) a substantial number of class members paid co-pays or co-insurance payments for branded and/or generic Intuniv that were higher than they would have been absent Defendants' conduct. Proof of class-wide antitrust impact can be accomplished relatively easily through well-accepted methodologies and using actual historical data of how Intuniv market dynamics would have changed had generic entry come earlier.[94] At trial, Dr. Rosenthal will rely on sales and pricing data to make this showing.[95]

Indeed, Plaintiffs may be entitled to a presumption of an antitrust impact, which can be established through common proof.[96] Additionally, Courts recognize a presumption of antitrust impact when the defendant has market power and is alleged to have conspired with its competition.[97] This presumption is common to all class members.

### e. Common Issues Predominate at to Aggregate Damages

Aggregate damages models are appropriate means of common proof to estimate class damages.[98] Here, Dr. Rosenthal employs well-established econometric principles to calculate

---

[93] *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 114, n. 9 (1969).
[94] Rosenthal Rpt. at ███████████████████████████████████████████████████████

███ Rosenthal Rpt. ████████

[96] *In re Cardizem Antitrust Litig.,* 105 F. Supp. 2d 618, 649 (E.D. Mich. 2000) ("[T]he ultimate conclusion as to what that evidence proves is for the jury.").
[97] *In re Actos End-Payor Antitrust Litig.,* 848 F.3d 89, 101 (2d Cir. 2017); *Terazosin,* 220 F.R.D. at 696.
[98] *See NASDAQ,* 169 F.R.D. at 526 (finding use of aggregate damages model in an antitrust case to be an appropriate "means to distribute damages to injured class members in the amount of their respective damages."); *see also In re*

class-wide damages that directly tie to Plaintiffs' theory of liability[99] and the resulting antitrust impact.[100] This aggregate damages model is itself common evidence, and is based on other common evidence including: (1) Defendants' internal  forecasts and pricing documents; (2) publicly available and purchased prescription data;[101] and (3) internal emails, presentations, and other documents kept by Defendants.[102]

Slight variations in the amount of damages as to each class member will not defeat class certification.[103] As Plaintiffs present an appropriate model for calculating aggregate damages, any issues pertaining merely to the *amount* of individual recoveries will not defeat certification.[104] Any "doubts as to the certainty of damages will be resolved against the wrongdoer[s], as the wrongdoer[s] must bear the risk of the uncertainty which [their] conduct has created."[105]

### 2. A Class Action is Superior to Other Available Methods of Adjudication

The proposed classes also satisfy Rule 23(b)(3)'s requirement that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." In analyzing superiority, relevant considerations include: (A) the class members' interest in individually controlling separate actions; (B) the extent and nature of any pre-existing litigation begun by or against class members; (C) the desirability of concentrating the litigation in the

---

*Pharm. Industry Average Wholesale Price Litig.,* 582 F.3d 156, 197-198 (1st Cir. 2009) (finding use of aggregate class damages "implied by the very existence of the class action mechanism itself."); *see also, Nexium I,* 777 F.3d at 26-31 (affirming reliance on aggregate damages model presented by Dr. Rosenthal).
[99] Aggregate damages "need not be exact," *Comcast Crop. v. Behrend,* 133 S. Ct. 1426, 1433 (2013) (internal citation omitted), as long as plaintiffs can show that defendants will "pay aggregate damages equivalent to the injury they caused." *Nexium I,* 777 F.3d at 19; *accord Comcast,* 133 S. Ct. at 1433.
[100] Rosenthal Rpt. at
[101] Rosenthal Rpt. at
[102] *See, e.g.,* Rosenthal Rpt. at
[103] *See Nexium I,* 777 F.3d at 21.
[104] *In re AWP,* 582 F.3d at 197-98.
[105]*See* Herbert B., Newberg & Alba Conte, Newberg on Class Actions § 10.05 at 10-8 (3d ed. 1992).

particular forum; and (D) the likely difficulties in managing a class action.[106] Class treatment of the proposed IPP consumer classes is *especially* warranted here, where numerous individuals suffered relatively small overcharges and have little incentive to bring individual actions. Progression of this litigation through the class action vehicle will produce efficiencies as to "time, effort and expense" and further prevent inconsistent decisions among class members.[107]

The proposed classes are also manageable. Manageability focuses on "practical problems that may render the class action format inappropriate."[108] "Antitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case."[109] Plaintiffs are not aware of any manageability issues and are willing to submit a proposed trial plan in support of same if requested by the Court.

## IV. CONCLUSION

For the foregoing reasons, the Indirect Purchaser Plaintiffs respectfully request that their Motion for Class Certification be granted in its entirety, and that Kanner & Whiteley and Golomb & Honik be appointed as class counsel.

---

[106] Fed. R. Civ. P. 23(b)(3)(A)-(D).
[107] *See, e.g.*, *In re Relafen*, 221 F.R.D. at 287-88 (citing *Amchem*, 521 U.S. at 615).
[108] *Eisen v. Carlisle and Jacqueline*, 417 U.S. 156, 164 (1974).
[109] *In re Carbon Black Antitrust Litig.*, No. 03-10191, (D. Mass. Jan. 18, 2005), 2005 WL 102966, at *22 (citations omitted).

Dated: November 1, 2018

Respectfully Submitted:

/s/ Conlee S. Whiteley
Allan Kanner, Esq. (*pro hac vice*)
Conlee S. Whiteley, Esq. (*pro hac vice*)
Marshall Perkins, Esq. (*pro hac vice*)
Layne Hilton, Esq. (*pro hac vice*)
Annemieke Tennis (*pro hac vice* forthcoming)
KANNER & WHITELEY, LLC
701 Camp Street
New Orleans, LA 70130
Phone: (504) 524-5777
a.kanner@kanner-law.com
c.whiteley@kanner-law.com
m.perkins@kanner-law.com
l.hilton@kanner-law.com
a.tennis@kanner-law.com

Ruben Honik, Esq. (*pro hac vice*)
David J. Stanoch, Esq.(*pro hac vice*)
GOLOMB & HONIK, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
rhonik@golombhonik.com
dstanoch@golombhonik.com

Stephen H. Galebach, Esquire (BBO) #65S006
GALEBACH LAW OFFICE
9-11 Touro Avenue
Medford, MA 02155
Phone: (617) 429-1966
steve@galebachlaw.com

*Attorneys for the Indirect Purchaser Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Marshall L. Perkins, hereby certify that, on November 1, 2018, the foregoing document was served, in redacted form, by filing, it on the court's CM/ECF system, which will automatically send a notification of such filing to all counsel of record via electronic mail. Full copies without redactions will be served to the parties via electronic mail.

<u>/s/ Marshall L. Perkins</u>